J-S33019-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
NACOLA DARCEL FRANKLIN :
:
Appellant : No. 2681 EDA 2017

Appeal from the PCRA Order July 31, 2017
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0004098-2012

BEFORE: OTT, J., McLAUGHLIN, J., and STEVENS*, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.: **FILED AUGUST 29, 2018**

Nacola Darcel Franklin appeals from the order denying her petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. We conclude that trial counsel was not ineffective and, therefore, affirm.

On August 11, 2012, Franklin stabbed and killed her fiancée, Billy Brewster. Franklin testified that she met Brewster in 2009 in California. N.T., 5/22/13, at 155. In June 2010, they moved to Pennsylvania. *Id.* at 157. She and Brewster got engaged in December 2011, *id.* at 163, and planned to be married on the day of Brewster's death, August 11, 2012, *id.* at 164. Franklin and Brewster lived with four minor children: Brewster's son W.B., Franklin's 11-year-old son A.I., Franklin's 15-year-old niece I.F., and Franklin and Brewster's nine-month-old son B.J. *Id.* at 162-63. Franklin testified that they had only one car, so that she drove Brewster to work at 6:00 p.m. and picked him up at 6:00 a.m. *Id.* at 166-67. On August 10, 2012, she had been

_____

* Former Justice specially assigned to the Superior Court.

shopping for a dress for I.F., had make-up and hair appointments, and had run various errands. *Id.* at 168-70. She stated she had not slept in days. *Id.* at 172.

The day before the wedding, August 10, 2012, Brewster's cousin, Nakia Kali, and his wife, Monique Kali, arrived from out of town, and were staying with Franklin and Brewster. *Id.* at 6. At approximately 9:00 p.m., Nakia, Monique, and Brewster went to a strip club. *Id.* at 10. After a few hours, they left the club and stopped at a restaurant. *Id.* at 12. Because Nakia had a headache, they returned to the apartment without ordering food. *Id.*

At the trial, Nakia, Monique, and Franklin testified as to what occurred after Nakia, Monique, and Brewster returned to the apartment.

Nakia testified that Brewster had "two drinks and a beer" while they were out. N.T., 5/22/13, at 12. He stated that when they returned to the apartment, Brewster asked whether Franklin and the kids wanted to get something to eat and "after that, . . . it was a back and forth, like, bickering." *Id.* at 14. Franklin and Brewster went to their bedroom, and Brewster "shut the door and said, we have company." *Id.* at 15. Nakia stated that he was in his bedroom, and that he could hear the back and forth between Franklin and Brewster, but did not hear what was being said. *Id.* at 15, 16. He did not hear broken glass or "furniture being tussled." *Id.* at 16. Nakia testified that he came out of the bedroom after hearing Franklin yell, "Anthony, give me the knife." *Id.* When he came out, Brewster's back was to the front door and Franklin was 7 or 8 feet in front of Brewster, holding a knife. *Id.* at 17. Nakia

told Franklin, "[D]on't do this," and "Put the knife down." *Id.* at 18. Franklin told him to get away or she would stab him. *Id.* Nakia saw Brewster's son, W.B., and Franklin's niece, I.F., who was holding B.J. *Id.* Nakia stated that Brewster did not have anything in his hands and that Franklin was yelling that she was "gonna kill" Brewster. *Id.* at 18-19. Nakia stated that he screamed at Brewster to get out and started walking toward Brewster. *Id.* at 19. As Nakia reached for the door, Franklin lunged at Brewster and started stabbing him. *Id.* Nakia said Brewster's hands were up when Franklin stabbed him, *id.*, and that Brewster said to Franklin, "Is this what you really want to do?" *Id.* at 26. Nakia grabbed Brewster, opened the door, and walked him outside. *Id.* at 20. When Nakia re-entered the apartment, he saw that Monique had Franklin restrained on the floor. *Id.* at 22. Monique told him to get the knife, which he did. *Id.* at 22-23. On cross-examination, Nakia reiterated that he could hear voices, but could not hear what Franklin or Brewster were saying until he heard Franklin ask for a knife. *Id.* at 32. He stated that he never saw B.J. in Brewster's hands, but did see I.F. walking away from Brewster with B.J. *Id.* at 34.

Monique testified that when they returned from the club, she and Nakia went to their bedroom. *Id.* at 54. She stated that Franklin was upset because she felt that she and Brewster needed to watch how they spent money. *Id.* at 55. Franklin and Brewster then went into their bedroom and Monique did not hear any activity after they closed the door. *Id.* at 56. She then heard Franklin say, "[G]et me a knife," and told Nakia to check on them. *Id.* Monique got

- 3 -

dressed and exited the room. *Id.* at 57. She saw Brewster with his back to the wall. *Id.* at 57. She also saw Franklin, Nakia, W.B., and I.F, who was holding B.J. *Id.* at 57-58. Monique stated that Nakia told Franklin to "[P]lease don't do this," and Franklin said, "[S]top, before I stab you." *Id.* at 61. In addition, after W.B. said, "[P]lease, don't do this," Franklin said, "[S]top or I will kill you." *Id.* at 61-62. She stated that when Nakia turned to open the door, Franklin lunged at Brewster and stabbed him. *Id.* at 62. Monique then wrapped her arms around Franklin and tackled her to the ground. *Id.* at 63. She stated that Brewster did not have anything in his hands at the time of the stabbing, *Id.* at 65, that his hands were in the air, and that he said, "[I]s this what you really want to do?" *Id.* at 66.

Franklin also testified. She stated that when she returned to the apartment after running the errands, Brewster was upset because she had spent money, and said he was going out. *Id.* at 171. While Brewster, Nakia, and Monique were at the club, Franklin gave B.J. a bath and played with him. She and the children cleaned, prepared the food for the wedding, decorated, and moved furniture. *Id.* at 172.

Franklin testified that Brewster was drunk when he came home and that they had an argument about where to get food. *Id.* at 174-75. After Brewster started yelling and called her a "stupid whore," they went to their bedroom. *Id.* at 175-76. In the bedroom, Brewster grabbed Franklin's face and pushed her to the ground. *Id.* at 176. She then called the police. *Id.* Brewster started swinging at her "but he was so drunk that it was kind of like he was moving

in slow motion, and [she] was dodging at the same time." *Id.* at 177. Brewster tackled Franklin to the bed, and she started scratching at his face. *Id.* She went to call the police again, but realized the prior call was still on, so began to talk loudly. *Id.* Franklin stated that Brewster tried to stomp her, but could not because he was so drunk, and that he threw a jumperoo at her, which hit her head and arm. *Id.* at 178. She stated that Brewster then picked up B.J. and was "going in his back pocket," she guessed for his keys or pocket knife. *Id.* Brewster headed toward the front door with B.J., and Franklin got a knife. *Id.* at 179-80. As Brewster was in front of the door, I.F. took B.J. from Brewster. *Id.* at 181. Franklin then states that Brewster came toward her and she "swung the knife at him." *Id.* She stated that I.F. and B.J. were behind her and she "kind of stood in the way so that he wouldn't go after them." *Id.* Brewster then came at her twice, he tried to get the knife from her, and she "kept lunging the knife at him." *Id.* at 182. She wanted to scare him, and had not realized that she had cut him. *Id.* Franklin testified that then "everybody just came out at the same time" and she "started hearing everybody." *Id.* She denied threatening Nakia or W.B. *Id.*

On cross-examination, Franklin said the jumperoo was really heavy and "[i]t was laying on top of me, and then when I got up, it was just on the floor." *Id.* at 197. Franklin did not remember Brewster putting his hands up. *Id.* at 218. She stated she lunged at Brewster before everyone was out and that after everybody came out she "started swinging the knife." *Id.* at 218-19.

Franklin also presented two character witnesses, who testified Franklin had an "excellent" reputation in the community for being "peaceable, non-violent, and law-abiding." N.T., 5/23/18, at 9, 13. On cross examination, both agreed that stabbing someone with a knife was not peaceful. *Id.* at 10, 15.

The jury also heard the transcripts from two 911 calls made by Franklin. The trial court described the first call as follows:

> Shortly after 2:00 a.m., [Franklin] called 911 to request help. On the 911 tape, [Franklin] and Brewster can be clearly heard arguing with one another. [Franklin] yells to her son [A.I.] to get her a knife. . . . [Franklin] repeatedly told Brewster to "give me my baby." She is heard telling Brewster he is "fuckin' drunk." She also admonishes Brewster to "put my baby down," "give me my fuckin' baby," and threatened him by yelling, "You know I'll swing at your dumb ass!" . . . On the 911 tape, [Franklin] can clearly be heard screaming "Die!" and threatening to stab Nakia. [Franklin] can also be heard threatening Brewster, saying, "Fucking die tonight. You wanna die tonight?"

Trial Court Opinion, filed Sept. 22, 2017, at 2 ("TCO") (quoting Trial Court Opinion, filed Aug. 15, 2014, at 1-6).[1]

Franklin placed a second 911 call "within minutes of the first" and "advised the dispatcher that her boyfriend just beat her up and stole her baby," and requested an ambulance because "she cut him for trying to take her baby." *Id.* at 3 (quoting TCO, 8/15/14, at 1-6).

Whitehall Township Police Officer Matthew Reszek testified that, when he arrived, Brewster appeared unconscious and was bleeding from a wound

---

[1] The recordings of the 911 calls are not in the record. They were played for the jury, 5/21/13, 98, and no one disputes the PCRA court's description of the calls.

- 6 -

on the left side of his body. N.T., 5/21/13, at 71. He contacted the Communications Center and told the dispatcher to have the responding ambulance expedited. *Id.* at 72.

Once other officers arrived on scene, Officer Reszek proceeded inside the apartment. *Id.* at 73. Officer Reszek encountered Nakia, Monique, Franklin, and several minor children. *Id.* at 74, 80-81. Franklin, who was visibly upset, was seated on the couch with Monique. *Id.* at 81. Officer Reszek asked about the location of the knife. *Id.* I.F. indicated she hid it in the kitchen and took Officer Reszek to the location where she had hidden it—in a cabinet underneath the sink. *Id.* at 81-82.

Detectives Richard Heffelfinger and Michael Marks testified that they did not notice anything unusual about the apartment, other than that the kitchen cabinet was open and the utensil tray was on the floor, N.T., 5/22/13, at 117, 127,[2] the wedding napkins, *Id.* 118, 127, and blood. *Id.* at 128. Detective Heffelfinger saw no evidence of a struggle. *Id.* at 118. Detective Marks stated that the jumperoo was "in the middle of the open area of the master bedroom just in front of the bed," and responded "no" when asked if it appeared damaged. N.T., 5/23/13, at 18.

An autopsy showed Brewster died of a stab wound to the heart. N.T., 5/22/13, at 105. The manner of death was homicide. *Id.* Dr. Isidore Mihalakis,

---

[2] I.F. had hidden the knife in the cabinet and placed the utensil tray on top of it, and Officer Reszek opened the cabinet and moved the tray to retrieve the knife. *Id.* at 117-18.

who performed the autopsy, testified that Brewster had wounds that were "indicative of a struggle" or "hand-to-hand combat." *Id.* at 101. Mihalakis also testified that Brewster had a .13% blood alcohol level at the time of his death. *Id.* at 107.

The jury was asked to determine whether Franklin was guilty of criminal homicide and, if so, whether she was guilty of first-degree murder, third-degree murder, voluntary manslaughter, or involuntary manslaughter. Verdict, 5/23/13. The jury found Franklin guilty of first-degree murder.

This Court affirmed the judgment of sentence, and on December 31, 2015, the Pennsylvania Supreme Court denied Franklin's petition for allowance of appeal.

On March 13, 2017, Franklin filed a timely counseled PCRA petition.[3] Franklin alleged her trial counsel was ineffective for failing to interview and call I.F. and A.I. as defense witnesses; failing to interview and call character witnesses from California; failing to object to improper cross-examination of character witnesses; failing to adequately review the sentencing guidelines

---

[3] Franklin's judgment of sentence became final on March 30, 2016, 90 days after the Pennsylvania Supreme Court denied her petition for allowance of appeal, when her time for seeking discretionary review with the United States Supreme Court expired. 42 Pa.C.S.A. § 9545(b)(3) ("a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review"); *Commonwealth v. Wilson*, 911 A.2d 942, 945 (Pa.Super. 2006) (finding judgment of sentence became final when 90-day period for filing for writ of *certiorari* with the United States Supreme Court expired). Therefore, she had one year from that date, or until March 30, 2017, to file a timely PCRA petition.

and plea offer with Franklin; failing to request a voluntary manslaughter, unreasonable belief self defense jury instruction; failing to request a use of force in self-protection jury instruction; failing to request the use of force for the protection of others jury instruction; failing to object to the Franklin's wearing of a shock belt to court for trial; and failing to elicit testimony from Franklin and a retained expert in support of a battered woman defense.

The PCRA court held a hearing, at which Franklin, I.F., A.I., and trial counsel testified.

Franklin testified that Brewster physically and mentally abused her, starting in late 2009. N.T., 4/28/17, at 8. The first instance of physical abuse occurred outside of their apartment in Whitehall, Pennsylvania. *Id.* at 9. Brewster did not like something Franklin said, so he grabbed her and shoved her against the car. *Id.* Franklin stated that Brewster was a jealous man, and would subject her to mental or physical abuse because he believed she was looking at other men. *Id.* at 9. He would choke her, hit her in the back of the head, and throw her against walls. *Id.* She stated the physical abuse occurred in their apartment and in the car. *Id.* at 10. She testified as to one instance where, because Brewster thought she was looking at another guy, he grabbed the wheel of the car and hit the guardrail of the highway, knocking the side mirror off the car. *Id.* She stated that when Brewster learned she was pregnant he picked her up and choked her against a wall. *Id.* at 13. Franklin stated the amount of abuse varied, and would increase due to Brewster's drinking, financial situation, or jealousy. *Id.* at 11. She would have bruises

following the physical abuse on her thigh and back of her neck, "places where people couldn't see." *Id.* at 14.

She further testified regarding mental abuse, including that Brewster would say he would kill her if she left or "put [her] out of the house" if she told anybody, including the police. *Id.* at 11. Further, Brewster carried a pocket knife, and had threatened her with the knife "countless times." *Id.* at 16. She sought help while pregnant, but, she said, there was not much they could do for her. *Id.* at 12. She did not seek the help of law enforcement because Brewster had told her he would put her out if she called the police, and she had nowhere to go. *Id.* at 15.

Franklin further stated that Brewster was "very angry, very demeaning toward [her] and the children" when he was drunk. *Id.* at 17. He had previously threatened her with the knife after he had consumed alcohol, placing it to her throat and saying, "I'll kill you if you ever leave me." *Id.* at 17-18. She stated that she packed up a few times to return to California, but each time Brewster or his mother convinced her to stay. *Id.* at 18. Franklin testified that Brewster's actions on the morning of the incident "w[ere] pretty much normal except for him trying to punch me in the face." *Id.* at 19. Franklin stated that she was afraid of Brewster. *Id.* at 20.

Franklin further stated that on one occasion she went to the emergency room of the Lehigh Valley Hospital to seek medical treatment for the abuse. *Id.* at 19. Although she told the hospital personnel that she fell down the stairs, she actually went because Brewster had "made [her] fall into the wall"

- 10 -

after they had an argument because Brewster wanted to take A.I. out while he was drinking. *Id.* at 19-20. She went to the hospital because she was pregnant at the time and concerned about the baby. *Id.* at 20. She also visited a doctor after Brewster kicked her in the ankle. *Id.*

Franklin testified that she had told her trial counsel about the abuse, both physical and mental. *Id.* at 21. She informed him that alcohol made Brewster more aggressive and that she was afraid of Brewster. *Id.* She also told counsel about the hospital visit, and signed a release allowing trial counsel to get the hospital records. *Id.* at 21-22. Franklin stated that trial counsel told her that he would not use the testimony about abuse "because he didn't want to make [Brewster] look bad." *Id.* at 22-23. She stated that at the time of the stabbing, Franklin was afraid Brewster was going to take the baby and was afraid for her life. *Id.* at 24.

Franklin also testified that both I.F. and A.I. witnessed part of the evening's events and that she had told trial counsel that she wanted them to testify. *Id.* at 29. Trial counsel told her they were too young to testify. *Id.* She further testified that she gave her trial counsel the names of the two potential character witnesses from California that she had known since childhood, but that he chose to call the witnesses from Pennsylvania. *Id.* at 36-37.

On cross-examination, Franklin testified that she told her trial counsel or his associate about the abuse, but was unsure whom. *Id.* at 50-51. She stated that she did not mention the abuse at trial and only discussed the facts

- 11 -

of August 10-11 because she was following her trial counsel's instructions. *Id.* at 54.

I.F. also testified at the hearing. She was Franklin's niece and began living with Franklin and Brewster one-and-a-half to two months before August 11, 2012. *Id.* at 60. She said Brewster drank often and would "talk of lot of mess" when intoxicated. *Id.* at 62. He was mean and "d[id] a lot of name-calling," including calling Franklin "bitch" and "whore." *Id.* at 62-63. She stated she "can't really say" whether there was physical abuse, but stated Franklin "would be strange." *Id.* at 63. As an example, she stated that they would often sneak to go out to eat or to the mall, she "guess[ed]" because Brewster wouldn't like it. *Id.* at 63-64. She stated that if he found out it probably would have started an argument, as Brewster and Franklin often argued. *Id.* at 64.

I.F. provided testimony about the events of August 11. She stated that when Brewster, Nakia, and Monique left for the club, Brewster "took a bottle of liquor with him." *Id.* at 62. Brewster, Nakia, and Monique were drunk when they returned home. *Id.* at 65. She was on the couch when they returned, but went to her bedroom, which she shared with A.I., shortly after. *Id.* at 65. She stated she could not hear everything Franklin and Brewster said, but heard "a boom, boom, boom." *Id.* at 66. She also heard Franklin say that "she wasn't going to let him hit her," and heard Brewster calling Franklin a whore. *Id.* at 66-67. She left the bedroom when she heard Franklin ask A.I. for a knife and say she would not let Brewster leave with the baby. *Id.* at 67. I.F.

- 12 -

said Brewster was upset and cursing and "yelling as he was trying to, like, he was trying to get an excuse to leave." *Id.* at 68. He had B.J. in one arm and she "believe[d]" he had his keys in the other. *Id.* I.F. got B.J. from Brewster. *Id.* She stated that after she had B.J., Brewster turned his attention "back to [Franklin]." *Id.* at 69. He was yelling and "saying I spent all this money and you can't go with me to get no food, and, like, just being belligerent." *Id.* As I.F. walked toward the couch with B.J., she was shaking, so Monique took B.J. *Id.* at 70. She did not recall whether Brewster tried to get past Franklin to get the baby, but agreed that Brewster was acting in an aggressive manner. *Id.* at 70, 73. She also said this was not the first time he acted in an aggressive manner, stating "we could hear stuff from our room, but I can't say that I actually would see, but we could hear them, like. And it wasn't good, you know? . . . [I]t didn't sound good." *Id.* at 74. She further said that after Franklin "poked" Brewster the first time, "he snatched her by her left arm, and then she did it again." *Id.* at 74-75. Nakia then took Brewster into the hallway. *Id.* at 75.

I.F. further testified that her grandmother told her that "some lawyer" called and she remembered speaking with him a month or two after the stabbing. *Id.* at 81, 84. She believed his name was "Joe or John." *Id.* at 81. She did not make arrangements to be there for the trial, and did not know that the trial had occurred. *Id.* She stated that no one told her she could testify at trial, but she "would have made it a point to be" there if they had. *Id.* at 83.

Franklin's son, A.I., testified next. He stated that Brewster's demeanor and attitude changed after consuming alcohol, including that he would say mean things when drunk. *Id.* at 88. A.I. never saw Brewster strike Franklin, but did see him yell at her and call her names, including "bitch" and "whore." *Id.* at 89. He further stated that Brewster would hit him with a belt if Brewster thought A.I. was lying. *Id.* at 90. Brewster would also yell and curse at A.I. *Id.*

A.I. testified regarding the events of August 11. He said that Brewster was drunk when he returned home. *Id.* at 93. He was "wobbling," and not walking straight. *Id.* Brewster told A.I. to get out of Franklin's bedroom, and then Brewster locked the door. *Id.* at 94. A.I. heard something that "[s]ounded like things being knocked over, thrown around" and heard Franklin and Brewster arguing. *Id.* at 92. He heard Franklin ask him to get a knife, and he got one from the kitchen and left it on the table. *Id.* at 95. He said he saw Brewster holding B.J. *Id.* at 96. Brewster wanted to take B.J. outside, which Franklin did not want. *Id.* He stated that I.F. took B.J. *Id.* at 97.

Franklin told Brewster he could not take the baby and that she would stab him. *Id.* at 98. Brewster taunted Franklin and told her to do it. *Id.* Brewster grabbed Franklin's left arm, *id.*, but A.I. was unsure whether he grabbed her before or after she stabbed him. *Id.* Brewster also walked toward I.F. to get the baby back, which Franklin did not want. *Id.* at 99. He stated both Franklin and Brewster were upset. *Id.* at 100.

A.I. recalled talking to an attorney at some point, but did not know whether the attorney represented Franklin. *Id.* at 100-01. He was never contacted to appear in court, and did not know when the trial occurred. *Id.* at 101. A.I. stated that Brewster had a pocket knife. *Id.* at 99. Brewster had never taken it out when he was mad, but did show it to A.I. a couple of times. *Id.*

Trial counsel also testified. He stated that Franklin informed him that Brewster would argue, yell, and scream when he consumed alcohol but said that she did not talk about physical abuse. *Id.* at 109. He stated he had his investigator look into abuse, but found no protection from abuse orders or police reports, and the neighbors did not know of abuse. *Id.* He said that "there was no evidence other than what [Franklin] told me about [Brewster] and his anger and temper when he consumed alcohol." *Id.* He stated that Franklin did not tell him about her visit to the Lehigh Valley Hospital, *id.* at 111, and did not recall requesting the medical records. *Id.* When asked whether he was familiar with "the medical records transmittal where medical records were requested for [Franklin] and the requester was [counsel]," he said he was not and that "maybe someone in [his] office did that." *Id.* When asked whether Franklin was being untruthful during her PCRA hearing testimony, counsel stated:

> When [Franklin] and I spoke, she told me that when [Brewster] would drink, he would be very, very angry. He would call her names. He would yell. He would scream and things along those lines, but there was no indication from

[Franklin] of her getting beaten up, physically abused, and there was no evidence of that.

*Id.* at 114. Counsel also stated that Franklin told him that "[Brewster] would get enraged and drink, and that at times she would be afraid of him" and that she felt threatened and afraid of him on August 11. *Id.* at 116.

Trial counsel stated that he may have restricted Franklin's testimony because he did not want to slander Brewster. *Id.* at 117. He stated that Brewster telling Franklin that he would put her out if she crossed him "may have come out . . . . It sounds along the lines of what [Franklin] told me when there would be arguments and he would be drinking." *Id.* at 118. Franklin also told him that Brewster was a jealous person. *Id.*

Trial counsel was next questioned about I.F. and A.I. He stated that he reviewed the discovery provided by the Commonwealth, including discs of the witness statements that I.F. and A.I. provided to the police, *id.* at 107-08, and "didn't find that they were going to be necessarily helpful in the defense," *id.* at 120. He, therefore, chose not to call them. *Id.* He was not sure whether he called Franklin's mom about I.F. and A.I. or whether he had his investigator, Joe Brown, speak with them, but said "after viewing their tapes of their interviews, I decided that they weren't going to be helpful for the defense." *Id.* at 121. Further, he did not believe the testimony he heard from I.F. and A.I. at the PCRA hearing would have been helpful to the defense, *id.* at 121, and noted that A.I. was 11 and I.F. was 15 at the time, *id.* at 122.

When discussing why he chose not to request a defense of others jury instruction, counsel stated: "It's just that part of the problem is, when you

look at the, the discs of [I.F. and A.I], [Brewster] was taunting [Franklin]. He had his, kind of his hands up saying, do it, you know, stab me, and she ultimately did that. That's why I didn't use that. So that's part of the problem. I mean, she still was revved up because the baby had been taken, and it's still a heat of passion in my eye, but that was part of the problem why I didn't use [I.F. and A.I.] because of the demeanor of [Brewster] at the time of how he was reacting when he did get stabbed." *Id.* at 131-32.

Counsel testified that he did not recall Franklin providing names of individuals from California for character witnesses. *Id.* at 125. He stated that after interviewing the two character witnesses from Pennsylvania who testified at trial, he "felt comfortable in their knowledge of [Franklin]" and decided to use them. *Id.* at 127.

Counsel stated that he did not request a defense of others instruction because "the child had been taken back . . . before he was stabbed." *Id.* at 131. When asked whether he believed Franklin was attempting to protect herself or protect the baby when she stabbed Brewster, counsel stated:

> I think she was just in a heat of passion from the baby being taken, and I think that she was, just her anxiety, her emotion because of what had happened. I think part of it was she was sleep-deprived. She was preparing for a wedding, all the things that I argued. She had been – all day she had been on the go. She was shopping. She was getting the kids clothing. She was getting her hair done. She probably hadn't slept like 20 minutes for four days. I think she was just running on empty, and I think then she's catching grief, getting yelled at. So I think her, if anyone was in the heat of passion, it was [Franklin] when this occurred.

*Id.* at 133. Counsel furthers stated he did not believe there was a factual basis for the unreasonable belief or self-defense jury instructions. *Id.* at 154.

On July 31, 2017, the PCRA court denied the petition. Franklin filed a timely Notice of Appeal.

Franklin raises the following issues on appeal:

> Whether the trial court erred when it denied [Franklin's] request for a new trial based on ineffective assistance of trial counsel, in failing to call [I.F.] and [A.I.] as defense witnesses; in failing to call adequate character witnesses; in failing to present evidence and retain an expert witness in support of a battered woman syndrome defense; in failing to request jury instruction 15.2503A Voluntary Manslaughter, sub-section (5) "Unreasonable Belief Self–Defense"; and, in failing to request jury instructions relating to "Use of force in self-protection" and "Use of force for the protection of other persons".

Franklin's Br. at 2.

Our standard of review from the denial of post-conviction relief "is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." *Commonwealth v. Ousley*, 21 A.3d 1238, 1242 (Pa.Super. 2011).

"[C]ounsel is presumed to be effective and the burden of demonstrating ineffectiveness rests on [the] appellant." *Ousley*, 21 A.3d at 1244 (quoting *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa.Super. 2010)). To prevail on an ineffective assistance of counsel claim, the petitioner must establish: "(1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered

actual prejudice as a result." ***Commonwealth v. Spotz***, 84 A.3d 294, 311 (Pa. 2014). To establish prejudice, the petitioner must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Commonwealth v. Johnson***, 966 A.2d 523, 533 (Pa. 2009) (quoting ***Strickland***, 466 U.S. at 694). "A reasonable probability 'is a probability sufficient to undermine confidence in the outcome.'" ***Commonwealth v. Stewart***, 84 A.3d 701, 707 (Pa.Super. 2013) (*en banc*) (quoting ***Commonwealth v. Burkett***, 56 A.3d 1260, 1272 (Pa.Super. 2010)). "The failure to prove any one of the three [ineffectiveness] prongs results in the failure of petitioner's claim." ***Ousley***, 21 A.3d at 1244 (quoting ***Rivera***, 10 A.3d at 1279).

## I.    Failure to Call Witnesses

To prevail on a claim of trial counsel ineffectiveness for failing to interview or call witnesses, a PCRA petitioner must establish:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

***Johnson***, 966 A.2d at 536 (quoting ***Commonwealth v. Washington***, 927 A.2d 586, 599 (2007)).

### A. Failure to Call Eye Witnesses

Franklin first contends her trial counsel was ineffective for failing to interview and call two eye-witnesses, I.F. and A.I. She argues their testimony

would not have undermined the heat-of-passion defense and claims there as a dispute about what happened that evening.

Trial counsel argued the jury should conclude that Franklin acted in the heat of passion and find her guilty of manslaughter. N.T., 5/23/13, at 37-38. To establish a heat of passion defense, "a defendant must prove (1) provocation on the part of the victim, (2) that a reasonable [person] who was confronted with the provoking events would become 'impassioned to the extent that his mind was incapable of cool reflection,' and (3) that the defendant did not have sufficient cooling off time between the provocation and the killing." **Mason**, 130 A.3d at 628 (quoting **Commonwealth v. Busanet**, 54 A.3d 35, 55 (Pa. 2012)).

The PCRA court found that trial counsel was not ineffective for failing to interview or call I.F. and A.I. as witnesses. It concluded that Franklin established the first four prongs of the test used to determine whether a failure to a call witness claim has merit, that is, that I.F. and A.I. existed, that they were available to testify for the defense, that counsel knew of their existence, and that they were willing to testify for the defense. TCO, dated 9/22/17, at 7. Franklin, however, "did not establish the absence of their testimony was so prejudicial that it denied [Franklin] a fair trial." **Id.** The court stated that trial counsel "credibly testified at the PCRA hearing that the two identified witnesses were relatively young at the time of trial." **Id.** Further, the court reasoned:

> [Counsel] reviewed the videotaped statements they made to the police shortly after the incident, which made him aware of what they would have been able to contribute to [Franklin's] defense. Furthermore, both witnesses testified at the PCRA hearing and offered testimony about the victim and his behavior toward [Franklin] during their relationship. [Trial Counsel's] defense strategy focused on [Franklin] in her capacity as a mother. He believed the jury would find she acted in the heat of passion because her motherly instincts caused her to react to Mr. Brewster attempting to leave their apartment with the parties' nine-month-old son while he was intoxicated. This was consistent with his underlying defense that the crime [Franklin] actually committed was voluntary manslaughter as opposed to murder. Negative testimony about the victim might have served to undermine that defense.

*Id.* at 7-8.

The PCRA court also noted that Franklin testified at trial that "Mr. Brewster appeared visibly intoxicated on the night of the incident" and that she "acted in order to stop Mr. Brewster from taking their nine-month-old child out of their apartment and from driving with him in the car while Mr. Brewster was intoxicated." *Id.* The transcript of the 911 call corroborated this, as "[Franklin] yelled that Mr. Brewster was 'fucking drunk' and demanded that he give [Franklin] her baby." *Id.* The PCRA court concluded that "[t]estimony from the minor children who observed this incident might have corroborated [Franklin's] version of the events that transpired leading up to Mr. Brewster's death, but the absence of their testimony did not deny [Franklin] a fair trial." *Id.* The PCRA court noted that Franklin's testimony "regarding the events that took place on the night in question was substantially consistent with the testimony offered by the Commonwealth's witnesses." *Id.* at 9. The PCRA

- 21 -

court concluded that Franklin did not demonstrate that the absence of the testimony denied her a fair trial or that trial counsel's choice not to call them prejudiced her. ***Id.***

This was not error. The testimony of A.I. and I.F. regarding the night of the homicide was cumulative of Franklin's testimony, which was corroborated by the 911 transcript. Furthermore, there is no reasonable probability that A.I. and I.F.'s testimony regarding Brewster's prior behavior while intoxicated would have changed the outcome. The testimony of A.I. and I.F. at the PCRA hearing gave no indication of prior physical harm, and, therefore, does not support a conclusion that, because of prior intoxicated interactions, Franklin believed Brewster would harm her or B.J. Franklin failed to establish the testimony denied her a fair trial or that she suffered prejudice. Accordingly, the PCRA court did not abuse its discretion in rejecting this claim.

### B. Failure to Call Character Witnesses

Franklin maintains counsel was ineffective for failing to call two character witnesses who lived in California. He argues that the California witnesses had a much longer relationship with Franklin than the character witnesses who testified at trial.

The PCRA court found that, even if the witnesses were available and willing to testify, Franklin failed to establish counsel was ineffective for failing to call them because the testimony of the character witnesses that trial counsel did call to testify was unrebutted:

[Trial counsel'] defense strategy did not entail challenging the credibility of Commonwealth witnesses. Moreover, he did in fact call character witnesses to testify on [Franklin's] behalf. Their testimony went unrebutted and largely uncontroverted by the Commonwealth. The only focus the Commonwealth placed on [Franklin's] character was that on the night she stabbed and killed the victim, her actions were not consistent with what [Franklin's] character witnesses would classify as peaceful. This left the jury to conclude that based on all of the evidence, [Franklin's] reputation was that she is peaceful, non-violent, and law-abiding with the exception of the incident for which she was on trial. Calling different or additional character witnesses to bolster the jury's understanding of [Franklin's] reputation would not have changed the evidence regarding the events of the night [Franklin] killed the victim. Accordingly, the Court properly concluded [Franklin] failed to demonstrate prejudice stemming from [trial counsel's] failure to call the proffered character witnesses.

TCO at 13-14.

We agree with the PCRA court that Franklin failed to demonstrate prejudice. Trial counsel presented two character witnesses, whose testimony was unrebutted by the Commonwealth. It is not reasonably likely that presenting the proposed character witnesses from California would have altered the outcome. The PCRA court did not err in denying Franklin's trial counsel ineffectiveness claim for failing to call character witnesses.

**II.   Use of Force in Self-Protection and Use of Force for the Protection of Other Persons Jury Instruction**

Franklin argues that trial counsel was ineffective for failing to request the use of force in self-protection or use of force for the protection of others jury instructions.

Section 505 of the Crimes Code provides that: "The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). Further, Section 506 provides:

> The use of force upon or toward the person of another is justifiable to protect a third person when:
>
> (1) the actor would be justified under section 505 (relating to use of force in self-protection) in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect;
>
> (2) under the circumstances as the actor believes them to be, the person whom he seeks to protect would be justified in using such protective force; and
>
> (3) the actor believes that his intervention is necessary for the protection of such other person.

18 Pa.C.S.A. § 506(a). Further, a claim of self-defense "requires evidence establishing three elements: '(a) [that the defendant] reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat.'" ***Commonwealth v. Mouzon***, 53 A.3d 738, 740 (Pa. 2012) (quoting ***Commonwealth v. Samuel****,* 590 A.2d 1245, 1247–48 (Pa. 1991)) (alterations in original).

The PCRA court found:

- 24 -

> Taking [Franklin's] testimony at the trial as true, Mr. Brewster was the initial aggressor in the altercation between himself and [Franklin]. However, [Franklin] acknowledged at trial that she escalated the altercation by asking her eleven-year-old son to get a knife. Up until that point, the fight had not involved any weapons aside from Mr. Brewster allegedly throwing a baby bouncer toy ("Jumperoo") at [Franklin]. [Franklin] made the conscious decision to introduce a deadly weapon into the fight between herself and Mr. Brewster. The testimony that she specifically asked for a knife under circumstances where neither she nor the parties' infant son were being threat[en]ed with a deadly weapon prior to that point belies her assertion she acted in self-defense. While Mr. Brewster was threatening to leave with the parties' infant son while he was intoxicated, he did not utilize or brandish any weapons at the time. By contrast, [Franklin] voluntarily escalated the situation when she obtained a knife, which defeats her self-defense claim.
>
> Defense counsel's strategic decision was to argue that this was a heat of passion killing which would justify a conviction for Voluntary Manslaughter. [Franklin] failed to establish that she was prejudiced by counsel not pursuing a self-defense or defense of others theory because the evidence from the trial reflects she escalated the situation. She would therefore legally have been precluded from arguing self-defense. Consequently, [Franklin] did not establish she was prejudiced by counsel's decision not to pursue self-defense or request jury instructions on that point of law.

TCO at 27 (internal citations omitted).

We conclude the PCRA court's conclusions are supported by the record. The testimony established that Franklin escalated the situation by requesting a knife. Accordingly, the PCRA court did not err in denying Franklin's counsel ineffectiveness claim.

### III.  Unreasonable Belief Self-Defense Jury Instruction[4]

Franklin next argues that trial counsel was ineffective for failing to request an unreasonable belief self-defense jury instruction.

Section 2503(b) of the Crimes Code defines unreasonable belief voluntary manslaughter, or imperfect self-defense, as follows:

> A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S.A. § 2503(b). "An imperfect self-defense claim 'is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required . . . . All other principles of justification under 18 Pa.C.S.A. § 505 must have been met.'" ***Commonwealth v. Rivera***, 983 A.2d 1211, 1225 (Pa. 2009) (quoting ***Commonwealth v. Tilley***, 595 A.2d 575, 582 (Pa. 1991)).

The PCRA court found that Franklin did not have an unreasonable belief that she felt would justify the killing:

> Rather, taking [Franklin's] testimony as true, the evidence suggested she had a reasonable belief that either she or her nine-month-old child was in danger, and she escalated the altercation between herself and the victim by grabbing a knife. She testified she swung the knife at him "[w]hen he came towards me." However, she explained[,] "He came at me twice, and I kept lunging the knife at him. And at that

---

[4] For ease of disposition, we will address Franklin's trial counsel ineffectiveness claims for failing to request jury instructions before addressing her trial counsel ineffectiveness claim for failing to present a battered-woman defense.

point, I didn't realize I cut him. I just wanted to scare him at that point." The evidence tended to support [trial counsel's] theory that [Franklin] acted in a heat of passion, which was the argument he made to the jury during his closing. [Franklin] did not act under an unreasonable belief that she felt would justify the killing; she testified she was only trying to scare Mr. Brewster, not to kill him. Accordingly, the instruction on "unreasonable belief in the need to act in self-defense" voluntary manslaughter would not have been supported by the evidence, and counsel's alleged failure to request that it be provided was not prejudicial to [Franklin].

TCO at 25 (internal citations omitted).

The PCRA court's factual findings are support by the record. Franklin wanted to scare, not harm, Brewster. Further, she escalated the interaction by asking A.I. to get a knife. Therefore, the PCRA court did not err in denying Franklin's ineffectiveness claim for failure to request an unreasonable belief self-defense jury instruction.

### IV.   Battered-Woman Defense

Franklin next claims that trial counsel was ineffective for failing to present evidence, including expert testimony, in support of a battered-woman syndrome. He argues counsel erred by not presenting evidence of Franklin's state of mind, including past physical, mental, and emotional abuse.

Evidence regarding the battered-woman syndrome is "admissible as probative evidence of the defendant's state of mind as it relates to a theory of self-defense." *Commonwealth v. Miller*, 634 A.2d 614, 622 (Pa.Super. 1993) (*en banc*). "The syndrome does not represent a defense to homicide in and of itself, but rather, is a type of evidence which may be introduced on the

question of the reasonable belief requirement of self-defense in cases which involve a history of abuse between the victim and the defendant." *Id.*

The PCRA court concluded that Franklin failed to establish she was prejudiced by counsel's failure to call an expert to testify as to a battered-woman syndrome because the "uncontradicted testimony at trial was that [Franklin] and Mr. Brewster got into a verbal confrontation which led to [Franklin] specifically instructing her minor son to 'get [her] a knife' and he obliged." TCO at 17. The court noted that the recording of the 911 call captured Franklin's statements that she was "gonna fucking kill you" and "going to cut you." *Id.* The court concluded that had Franklin testified about the alleged abuse, it "would have put her credibility at issue," and "would not have aided [trial counsel's] trial strategy of demonstrating this was a heat of passion killing." *Id.*

The PCRA court's conclusions are supported by the record and its conclusion that counsel was not ineffective for failing to present a battered-women defense was free of legal error. As discussed above, the evidence presented at trial d id not support a self-defense instruction because Franklin escalated the situation. Therefore, counsel's strategy of pursuing a heat-of-passion defense was reasonable, as was the decision to not present evidence of Brewster's prior conduct, which may have hurt Franklin's credibility.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/29/18